**Calvin HARMAN, Plaintiff,**

v.

**CONTINENTAL AIRLINES, INC. LONG–TERM DISABILITY PROGRAM FOR PILOTS, Defendant.**

**No. 0460959CIVCOHN.**

United States District Court, S.D. Florida.

April 21, 2005.

Kirk W.B. Wagar, Wagar Murray & Feit P.A., Coconut Grove, FL, for plaintiff.

Susan H. Stern, Jackson Lewis LLP, Miami, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COHN, District Judge.

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judg-

ment [DE # 21], Defendant's Notice of Filing Corrected Exhibits in Support of Motion for Summary Judgment [DE # 31], Plaintiff's Motion for Summary Judgment [DE # 24], Plaintiff's Response to Defendant's Motion for Summary Judgment and Plaintiff's Memorandum in Support of Summary Judgment [DE # 26], Plaintiff's Statement of Undisputed Material Facts and Response to Defendant's Statement of Undisputed Material Facts [DE # 27], Defendant's Reply in Support of its Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment [DE # 32], and Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment [DE # 37]. The Court has carefully reviewed the parties' submissions and is otherwise fully advised in the premises.

## I. BACKGROUND

This is an Employee Retirement Income Security Act of 1974 ("ERISA") action brought by Plaintiff Calvin Harman against Defendant Continental Airlines, Inc. Long–Term Disability Program for Pilots to recover long-term disability benefits. The Long–Term Disability Plan ("LTD Plan")[1] is part of the employee welfare benefit plan ("the ERISA Plan") that Continental Airlines, Inc. ("Continental") offers to its eligible pilot employees. Continental and the LTD Plan's eligible pilot employees jointly fund the LTD Plan.

Continental is the Plan Administrator for the LTD Plan. The LTD Plan's Administrative Committee is responsible for the general administration of the LTD Plan and for carrying out the provisions thereof. The Administrative Committee has the authority to appoint a Claims Administrator to handle claims under the LTD Plan. The Administrative Committee appointed Har-

vey Watt & Co. ("Harvey Watt") as Claims Administrator for benefits determinations under the LTD Plan.

As a Continental pilot who paid premiums to the LTD Plan, Plaintiff was eligible for disability benefits if he became disabled within the meaning of the LTD Plan while employed by Continental. The Plan defines "disability" or "disabled" in pertinent part as:

(a) In the case of a Company Pilot whose Disability Date is on or after January 1, 1998, (i) the Participant's loss of his or her Federal Aviation Administration Medical Certificate for reasons other than alcoholism or drug abuse, or (ii) the Participant's failure to pass a Company physical examination due to medical reasons other than alcoholism or drug abuse.

(b) In any other case, either a Loss of License Disability or a Total and Permanent Disability, as defined below in this Section 1.11(b):

(i) *Loss of License Disability.* "Loss of License Disability" means the demonstrated inability, as determined by the Administrative Committee pursuant to the procedures set forth in Section 3.8, of a Participant to pass, for medical reasons other than alcoholism or drug abuse, a physical examination(s) required by the Federal Aviation Administration or the Employer.

(DE # 21, Ex. A–1, § 1.11).

Moreover, Section 3.8 of the LTD Plan provides in part:

The Administrative Committee shall have the right to require a Participant to submit proof that he or she has incurred a Disability or continues to be Disabled.

---

1. The LTD Plan was enacted on February 1, 1984 and amended and restated on January 1, 1998 and again on April 23, 2002. The January 1, 1998 version was in effect at the time Plaintiff became disabled and controls here.

If so specified by the Administrative Committee, such proof shall include... the results of any medical, physical, or other examination(s) required by the Administrative Committee or any Employer... During the period that the Participant is receiving benefits under the Plan, the Participant is expected to make every reasonable effort to correct the mental or physical defect which led or contributed to his or her Disability... Any failure, as determined by the Administrative Committee, on the part of the Participant to submit proof of continued disability... shall render the claim void, and the right to and the payment of any benefits under the Plan which would otherwise be payable to such Participant shall cease.

(DE # 21, Ex. A–1, § 3.8).

Plaintiff submitted a claim for disability benefits to Harvey Watt on March 3, 2000. Plaintiff claimed a "Loss of License" disability under the LTD Plan following coronary artery disease for which he was first treated on November 14, 1999. (DE # 21, Ex. A–2). By letter dated August 7, 2000, the Federal Aviation Administration ("FAA") determined that Plaintiff was not qualified for any class of medical certificate at that time. (DE # 21, Ex. A–6). By letter dated September 14, 2000. Continental informed Plaintiff that his claim for disability benefits under the LTD Plan had been approved. (DE # 21, Ex. A–8). Plaintiff was told that he would continue to receive benefits until the date that he was no longer disabled or the date of his 60th birthday.

In November 2003, after completing a review of Plaintiff's file, the Administrative Committee advised Plaintiff that his benefits would be suspended effective December 1, 2003, pending his cooperation in undergoing a coronary angiography (also referred to as a cardiac catheterization). (DE # 31, Ex. A–24). The Administrative Committee also informed Plaintiff that FAA recertification procedures require an angiography in order to evaluate a pilot's coronary heart disease. (*Id.*) The Administrative Committee explained that Harvey Watt advised that the FAA would not recertify Plaintiff without an angiography and that Plaintiff's continued refusal to undergo the procedure prevented him from being considered for recertification by the FAA. (*Id.*) On January 28, 2004, Plaintiff filed an appeal with the Administrative Committee. (DE # 31, Ex. A–25). By letter dated March 25, 2004, the Administrative Committee informed Plaintiff that his benefits under the LTD Plan would remain suspended. (DE # 31, Ex. A–27).

## II. *SUMMARY JUDGMENT AND ERISA STANDARDS*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

It is undisputed that this is an ERISA action. ERISA does not provide standards for reviewing the decisions of plan administrators or fiduciaries. *See Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1134 (11th Cir. 2004) (*citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). However, the Eleventh Circuit held that *Firestone* established three distinct standards for reviewing such decisions: "(1) *de novo* review where the plan does not grant the administrator discretion [*i.e.,* does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3)

heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." *Id.* Courts read *Firestone* broadly and apply its three levels of review to both plan interpretations and factual determinations. *Id.* at n. 3.

■ Here, it is undisputed that the Administrative Committee has discretionary authority under the LTD Plan. (DE # 21, # 26). Thus, the appropriate standard of review would be arbitrary and capricious, absent the existence of a conflict of interest. *Williams* set forth the approach for judicial review of ERISA-plan benefit denials:

■ (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision);[2] if the decision is not wrong, end the inquiry and affirm the decision.

■ (2) If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

■ (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

■ (4) If no reasonable grounds exist, then and the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

■ (5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

■ *Williams*, 373 F.3d at 1138. Thus, the claim administrator's benefits-denial decision must be "wrong" before the reviewing court makes a conflict of interest determination. *Id.*

### III. *ANALYSIS*

Approximately two weeks after Continental informed Plaintiff that his claim for disability benefits under the LTD Plan had been approved, by letter dated September 29, 2000, Harvey Watt requested an update regarding the status of Plaintiff's FAA certification. (DE # 21, Ex. A–9). In November 2000, Harvey Watt contacted Plaintiff who refused to undergo catheterization to determine whether he could regain his FAA certification. (DE # 21, Ex. A–10).

In September 2001, Harvey Watt requested an update from Dr. Roy Wittingham, Plaintiff's treating physician, regarding Plaintiff's medical condition. (DE # 21, Ex. A–12). Plaintiff responded by stating. "There has been little change in my health. My doctor still does not recommend further catheterizations. I still do not intend to undergo further heart catheterizations unless my medical condition requires such procedures." (*Id.*)

On December 14, 2001, Harvey Watt asked Plaintiff to have Dr. Wittingham

---

2. *Williams* cited *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 n. 23 (2001), after stating the first step of the approach that it set forth. *See Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1138, n. 7 (11th Cir. 2004). Footnote 23 of *HCA* provides that " 'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." Therefore, the Court must confine its *de novo* review to the LTD Plan administrative record.

provide an update on Plaintiff's condition. (DE #21, Ex. A–13). On December 28, 2001, Harvey Watt received Dr. Wittingham's Physician Statement in which Dr. Wittingham stated that there had been no change in Plaintiff's condition since his prior report. (DE #21, Ex. A–14). In response to a question about whether he believed Plaintiff was unable to perform the duties of his regular occupation, Dr. Wittingham stated, "Determined by FAA." (Id.) Following receipt of Dr. Wittingham's Physician Statement, on January 7, 2002, Harvey Watt requested Plaintiff's medical records for the previous six months. (DE #21, Ex. A–15). Plaintiff's stress test results revealed "negative for ischemia by EKG criteria" and "excellent exercise tolerance for age." (DE #21, Ex. A–16).

On December 31, 2002, Harvey Watt contacted Plaintiff regarding his condition. (DE #21, Ex. A–18). Plaintiff agreed to send the results of his January 2003 stress test. (Id.) Plaintiff's stress test results concluded that he had "normal myocardial perfusion" and "normal left ventricular systolic function." (DE #21, Ex. A–19). In a telephone call with Harvey Watt on February 11, 2003. Plaintiff acknowledged that "all functions appear to be normal" but refused to undergo a catheterization in order to be recertified. (DE #31, Ex. A–20).

By letter dated June 26, 2003, Harvey Watt requested that Dr. Wittingham provide a "brief narrative report on [Plaintiff's] present condition and prognosis for recovery." (DE #31, Ex. 21). Dr. Wittingham provided his summation of Plaintiff's August 2003 follow up visit, the results of which were normal. (DE #31, Ex. A–22).

In September 2003, Dr. James M. Wilson, M.D., Director Cardiology Education, Assistant Chief of Cardiology at St. Luke's Episcopal Hospital/Texas Heart institute,

provided Harvey Watt with a report concerning the risk involved while undergoing an angiography. (DE #31, Ex. A–23). In Dr. Wilson's opinion, the associated risk factor was to be considered quite low at 0.3%. (Id.). Dr. Wilson stated that the American Heart Association and American College of Cardiology have produced guidelines for the performance of an angiography that weigh the procedural risk against the possible benefit of the procedure and that the weight of evidence/opinion is in favor of usefulness/efficacy in individuals whose occupation involves the safety of others, such as pilots, who have cardiac histories similar to Plaintiff. (Id.) Moreover, Dr. Audie Davis, M.D., Medical Director Harvey W. Watt & Co., stated that the angiography procedure is a requirement imposed by the FAA for recertification. (Id.)

In February 2004, Dr. Davis discussed this case with Dr. Stephen Carpenter, FAA, CAMI, Oklahoma City. (DE #31, Ex. A–26). Dr. Carpenter refuted Plaintiff's contention that the FAA would not certify Harman based on his alleged 60% blockage of the left anterior coronary artery. (Id.) Dr. Carpenter concurred with Dr. Davis that, as long as Plaintiff's stress tests demonstrated no ischemia, the FAA would consider Plaintiff's application for recertification. (Id.) Dr. Harman concluded that based on Plaintiff's cardiac test results, it appeared likely that he could be recertified if he underwent an angiography. (Id.)

In summary, the administrative record contains: (1) the normal results of Plaintiff's repeated stress tests by his treating physician. Dr. Roy Wittingham. (DE #21, Exs. A–16 and A–19; DE #31 Exs. A–20 and A–22); (2) the medical opinion of Dr. James M. Wilson, M.D., Director Cardiology Education, Assistant Chief of Cardiology at St. Luke's Episcopal Hospital/Texas Heart Institute, that any risk

associated with an angiography was quite low at 0.3%. (DE # 31, Ex. A–23); (3) the medical opinion of Dr. Stephen Carpenter, FAA, CAMI, Oklahoma City, that Plaintiff would likely be recertified by the FAA if he underwent this procedure. (DE # 31, Ex. A–26); and (4) the guidelines issued by both the American Heart Association and the American College of Cardiology favoring an angiography under the factual circumstances of this case. (DE # 31, Ex. A–23).

■ The LTD Plan expressly places the burden on Plaintiff to submit proof of continued disability. (DE # 21, Ex. A–1, § 3.8). Plaintiff is disabled because he lost his FAA certification. Thus, Plaintiff was required to show that he was not able to obtain FAA recertification in order to maintain his disability status. FAA recertification procedures require all pilots with Plaintiff's medical condition to undergo an angiography. Plaintiff has stated his refusal to undergo this procedure in August 2000, January 2001, January 2002, January 2003, and July 2003. (DE # 31, Ex. 24). Hence, Plaintiff's inaction prevented him from being considered for FAA recertifica-

tion; such recertification would allow Plaintiff to shed his disability status. Based on the Court's *de novo* review, the Court concludes that the Administrative Committee's decision was not "wrong." The Court does not disagree with the Committee's decision to suspend Plaintiff's benefits under the LTD Plan. Therefore, under *Williams*, the Court must end its inquiry here and affirm the Administrative Committee's decision.[3] *See Williams*, 373 F.3d at 1138.

## IV.  CONCLUSION

Based on the foregoing, it is **OR-DERED AND ADJUDGED** as follows:

(1) Defendant's Motion for Summary Judgment [DE # 21] is hereby **GRANT-ED**.

(2) Plaintiff's Motion for Summary Judgment [DE # 24] is hereby **DE-NIED**.

(3) Final Judgment will be entered in a separate Order.

---

3. The Court notes that its decision does not constitute an order that Plaintiff undergo any

procedure that he does not consent to.